**Donn VonderAHE and Barbara Vonder-Ahe, Plaintiffs-Appellants,**

v.

**Roy H. HOWLAND et al., Defendants-Appellees.**

**No. 71–1982.**

United States Court of Appeals, Ninth Circuit.

Nov. 7, 1974.

Rehearing Denied Feb. 18, 1975.

Before MOORE,* BARNES and ELY, Circuit Judges.

MOORE, Circuit Judge:

Just after 8:00 A. M., on the morning of June 16, 1970, a group of four Special Agents of the Internal Revenue Service (IRS) arrived at the office of Dr. Donn VonderAhe, a dentist practicing in Fremont, California. Simultaneously, a second group of three agents arrived at the home of the doctor and his wife, Barbara, in Newark, California. Each group was armed with a search warrant issued by a United States Commissioner. The Agents then proceeded to search or, more accurately, to ransack both office and home and to asport practically every piece of paper they could lay their hands on.

The background to this rather extraordinary procedure is best portrayed somewhat chronologically.

Dr. VonderAhe (usually referred to herein as the "doctor") apparently has a successful dental practice. On June 16th his office consisted of eight rooms and a hallway. He had one or more employees who kept his patients' records and recorded bills and payments.

The doctor and his wife, Barbara, filed joint income tax returns. In the early part of 1969, i. e., between early January and late March, an IRS Agent (Holmes) made an audit of their 1966 and 1967 income tax returns. There were made available to him six sets of records for the years in question: (1) combined cash-receipts-cash-disbursements journal; (2) bank statements and cancelled checks; (3) savings account passbooks; (4) daily patient appointments book with amounts charged and amounts collected; (5) patient cards containing dental information together with charges and collections; and (6) cash receipts books. Agent Holmes found that the books and records examined accurately reflected the income re-

Neil F. Horton (argued) of Johnston, Klein & Horton, Oakland, Cal., for plaintiffs-appellants.

Crombie J. D. Garrett (argued), Atty., Appellate Section, Dept. of Justice, Washington, D. C., for defendants-appellees.

* The Honorable Leonard P. Moore, Senior Circuit Judge for the Second Circuit, sitting by designation.

ported, and recommended acceptance of the taxpayers' returns as filed.

This recommendation was not long to endure because a telephone call from a former employee, Lynette Bush, to IRS revealed that the doctor during her period of employment had maintained two sets of records. This former employee was most specific concerning the records and the location thereof. She stated that the records of "regular" patients were recorded on white "Banco" cards; those of "emergency" patients on yellow sheets—subsequently green cards. She further disclosed that checks received for services from patients listed on the yellow sheets or green cards were hand endorsed by the doctor and cashed by another employee.

In the office, according to Mrs. Bush and Mrs. Van Order, another former employee of Dr. VonderAhe, the "emergency" cards were kept in a portable file cabinet maintained in the "opratory" room, separate and apart from the other file cabinets (Bush, Aff., June 14, 1970) or, during Van Order's regime, in the third drawer of the cabinets on the right side of the office.

There were four "emergency receipt books" during the period of employee Bush's employment, and three during employee Van Order's tenure, which were relevant to VonderAhe's allegedly unreported income. The books in question were described as "approximatly one inch thick with six receipts per page." When filled, they were taken to the doctor's home.

Agent Romano was assigned to investigate further. To him it was obvious that if only the white card income had been disclosed to Agent Holmes, the doctor's income would have been understated by the amount of the yellow sheet/green card "emergency" income. At least an investigation was in order to ascertain whether it had been reported. This suspicion was strengthened by remarks made by another employee, a Mrs. Comegys, who told the Agent that she and the doctor had removed the yellow sheets and green cards from the files when the 1969 audit was pending; that the doctor had taken these records to his home so that they would not be available to the Examining Agent; and that the doctor had instructed her to remain at home on the day of the audit so that she would not give any "wrong" answers. In addition to information about the cards and books, Mrs. Comegys stated that she had, in 1968, arranged the opening of a Swiss bank account for her employer and had deposited a check for $6,050 therein.

### The Search Warrant

Having received this information, IRS was alerted to the fact that there existed previously unexamined yellow sheets and green cards and books in which entries therefrom had been made. There were various ways by which these records could have been obtained. The doctor had voluntarily made available to Agent Holmes all records of income received from his "regular" patients. Confronted with the knowledge that IRS knew of the withheld records, the doctor was scarcely in a position to place the undisclosed records in a different category from the disclosed. The Agents could have asked for them; they could have subpoenaed them; or, if they thought that there was danger of destruction, they could have sought a warrant. The service chose this last course of action.

In spite of the fact that the "things" to be seized and the places to be searched were known to the Service with a high degree of specificity, the warrants as they were requested and issued were, for all practical purposes, "general warrants." The property allegedly concealed was described as: "Fiscal records relating to the income and expenses of Dr. Donn VonderAhe from his dental practice and other sources since January 1, 1966, to date, including, but not limited to dental patient cards, appointment books, combined appointment-cash receipts books, combined cash receipts and cash disbursements journals, business ledgers, expense records, bank ledger

sheets and statements, cancelled checks, bank savings account pass books, records and correspondence relating to the opening of and deposits and withdrawals from a bank account maintained by said Doctor at the Banaue Romande in Geneva, Switzerland, plus copies of invoices and bills sent to patients of the aforesaid Doctor."

The grounds for search and seizure were stated as: "now and have been used as a means of committing and constitute evidence of offenses in violation of the provisions of the Internal Revenue laws; particularly Sections 7201 and 7206(1) of Title 26 United States Code; and which further comprise and constitute evidence of offenses committed in violation of the laws of the United States within the meaning of Section 1001 of Title 18, United States Code."

There was no allegation in the supporting affidavit of Agent Holmes that he sought to re-audit the material listed by him as already audited and reconciled. In the principal affidavit of Agent Romano, he states that he has "reason to believe that the amount of fees collected from patients during the years 1966 and 1967 whose names appeared on yellow information sheets were intentionally segregated by Dr. VonderAhe and Mrs. Comegys and not made available to Revenue Agent Holmes for the audit examination of early 1969." Thus, what had been *revealed* and what had been *concealed* had already been made abundantly clear.

### The Execution of the Warrants

#### The Office

According to Dr. VonderAhe, at about 8:15 A. M., on June 16, 1970, three (elsewhere stated as four or five) Treasury Agents forced their way into his inner office. They apparently took over the premises, and continued their search until 1:15 P.M. The search necessitated cancellations of patient appointments because the Agents seized patient cards and records and virtually were in charge of the office. The doctor alleges that he

was unable to resume his practice for approximately two weeks when most of the original records were returned.

The extent of the seizure may be judged by the list ("Document Receipt") made by the Agents, which consisted of thirty-two pages of papers and records which were carted away in cartons in a small truck. By way of brief illustration, the Agents took the contents of the drawers of the doctor's desk in his private office, including correspondence relating to the purchase of property in Bull River, Montana, a U-Haul rental contract, an application for insurance, personal letters, notes relating to the VonderAhe's planned new home, and correspondence with an investment advisory service. Hundreds of patient record cards were taken. The receptionist's desk was also searched.

#### The Home

The warrant enforcement technique employed by the Agents at the home was quite similar to that used at the office. They forced their way in, made a room by room search of the premises, searched the contents of Mrs. VonderAhe's purse and even that of a Mrs. Perez, a visiting friend. Items were seized in an unused bedroom involving the VonderAhe's real estate and records labeled "New House." Again, over objection, an IRS Agent forced his way into the VonderAhe's car which was parked in their garage and searched it. Papers taken from the garage included many folders of patients' records, "lab slips," etc. Several cartons of seized material were loaded into a truck and taken away.

The oral protests of the VonderAhes were quickly followed by legal protests. From a procedural point of view, Rule 41(e) of the Federal Rules of Criminal Procedure was unavailable to the doctor because neither he nor his wife had been indicted and there was no criminal case in being against them. However, they were well aware of potential civil and criminal consequences of the alleged concealment of records. They quite natu-

rally desired to cause these records to be unavailable for use by the Commissioner or by a Grand Jury. Accordingly, they brought "an independent civil action prior to indictment pursuant to the Court's inherent equity power seeking return of property seized and its suppression as evidence in any subsequent criminal proceedings." (Applts' Br. p. 14). By this "independent equitable action" they sought to avoid the appealability question which might have otherwise arisen. Thus, having invoked the equity powers of the court, they must abide by this standard. In their complaint, filed July 7, 1970, they sought (1) the return of their books and records; (2) an injunction against the use of their property, allegedly illegally seized, in any investigation and prosecution against them; (3) an injunction against the use of copies or notes made from the material seized for prosecution purposes; (4) an injunction against contacting persons or businesses, the names of which were disclosed in the seized material; (5) the suppression of the property seized as evidence in any "criminal proceeding" and in any proceeding to determine the tax liability of the VonderAhes; and (6) a hearing to be held by the court, prior to the presentation of the evidence to a Grand Jury or a Commissioner, at which the defendants "shall prove that said evidence was not illegally obtained." By leave of court, the complaint was amended to assert damages suffered by the disruption to the doctor's dental practice caused by the Agent's action in the amount of $15,000.

The government moved to dismiss the complaint on the grounds that (1) the United States had not consented to be sued; (2) the court lacked jurisdiction over the subject matter; and (3) that the complaint failed to state a claim upon which relief could be granted.

In the meantime, the government had photocopied the seized records and returned the originals.

The District Court denied the VonderAhes' motion for a preliminary injunction and granted the government's motion to dismiss. The doctor and his wife appealed.

### Jurisdiction

A threshold question is posed with respect to our jurisdiction to entertain this appeal. The government contends that we are without jurisdiction because the decision of the district court did not result in a final order as required by 28 U.S.C. § 1291. We have held that an order dismissing an action for the return of documents and for the suppression of evidence is final and appealable when a plaintiff, as here, seeks recovery of copies and when no criminal action is pending. Goodman v. United States, 369 F.2d 166 (9th Cir. 1966); Selinger v. Biglar, 377 F.2d 542 (9th Cir. 1967). Our finding of appealability is reinforced by United States v. Ryan, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), in which the Supreme Court said: "We have thus indicated that review is available immediately of a denial of a ·motion for the return of seized property, where there is no criminal prosecution pending against the movant. See DiBella v. United States, supra, 369 U.S. at 131–132, [82 S.Ct. 654, 7 L.Ed.2d 614]." 402 U.S. at 533, 91 S.Ct. at 1582. Accordingly, we conclude that the order of the court below was final and that we have appellate jurisdiction under 28 U.S.C. § 1291.

### The Fourth Amendment

Initially, the search and seizure must be considered within the confines of the Fourth Amendment. In fact, limitation to consideration of this appeal within the confines of the Fourth Amendment is suggested by the taxpayers themselves in arguing (Appellants' Brief, pp. 12, 13) that "assuming the Court finds probable cause for a search warrant to exist, the government's showing of probable cause did not justify the extent of the searches and seizures at bar," and that "the affidavits only justfied the search for the records which the taxpayers allegedly had withheld, the location

of which an employee of the VonderAhes had described to the Treasury Agents."

The Fourth Amendment declares the "right of the people to be secure in their persons, houses, papers and effects" but only against *"unreasonable searches and seizures"* (emphasis supplied). Any warrant therefor shall issue "upon probable cause" and shall describe "the place to be searched, and the persons or things to be seized." As to "probable cause," the district court found that "the affidavits submitted were more than sufficient to provide probable cause to believe that plaintiffs were violating the income tax laws."

█ But the words "probable cause" are not self-defining—"probable cause" for what? The supporting affidavits were quite specific in describing the allegedly concealed property, namely, yellow sheets and green cards. No facts were alleged which showed probable cause for the issuance of a general warrant. No charge was made that the books and records submitted to Agent Holmes were false and that they should be subjected to a re-audit. To proceed by the "warrant" method without first seeking the desired papers by request or subpoena should be based upon the strongest showing of necessity but if such drastic procedure is to be availed of, it should be strictly limited as constitutionally required. Therefore, although there may have been "probable cause" to search for and seize the yellow sheets and green cards for 1966 and 1967, there was no probable cause shown for a seizure of all the doctor's dental books and records, or his personal and private papers.

█ In seeking and executing such a general warrant, the agents themselves must assume the responsibility for its breadth. They could have restricted it to the concealed items and thus have avoided the ransacking procedure in which they, in executing the warrant, indulged.

There remain for consideration specificity and unreasonableness, issues which are subject to a similar analysis.

Although the District Court noted that "general warrants which fail to adequately specify the area to be searched or the items to be seized have historically met with judicial disapproval," it held that "the warrants were as specific as practical" and while recognizing their "broad scope," they were "not overly broad in a constitutional sense."

What is "overly broad" cannot be resolved in an abstract or academic manner but only in relation to the facts, circumstances under, and the purpose for, which the warrants were issued. The warrants here were, in effect, general warrants. They sought all fiscal records of the doctor from January 1, 1966 to date [June 1970] relating to his income and expenses "but not limited to [books and records enumerated] * * *." In short, except for the yellow sheets and green cards, this was the identical material which had been delivered to and examined by Agent Holmes.

The Supreme Court has stated that there are certain permissible standards to be applied in connection with the issuance of search warrants. Thus in Berger v. New York, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967), the Court said:

> "The proceeding by search warrant is a drastic one," Sgro v. United States, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932), and must be carefully circumscribed so as to prevent unauthorized invasions of "the sanctity of a man's home and privacies of life." Boyd v. United States, *supra*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, [29 L.Ed. 746].

And in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Court said:

> The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings. [Citations omitted.] The war-

rant accomplishes this second objective by requiring a "particular description" of the things to be seized.

■ Upon the information available to it, the government knew exactly what it needed and wanted and where the records were located. There was no necessity for a massive re-examination of all records bearing on income and expenses. Were this the law, the Commissioner, upon finding any suspicious deficiency, could order a seizure of every such taxpayer's records upon the mere allegation that the omission or an inaccurate statement of one item might bespeak inaccuracies as to others which, in his opinion, necessitates a seizure of all records, at office and home. Important as it is to enable the government to obtain information to assure itself of the correct reporting of taxes, it is difficult to believe that the draftsmen of the Fourth Amendment did not insert "unreasonable" to avoid just such an *in terrorem* state as the Agents created and wreaked here.

Moreover, just as "unreasonable" can be applied to the breadth of the warrant, so much the more can it be applied to the manner of execution because it is the "manner" which, as vividly illustrated by the facts of this case, can create and constitute the prohibited invasion. As previously mentioned, the Agents could have sought the allegedly concealed records by other means. If they had desired to question the accuracy of patient payments, they could have made a patient check. All this could have occurred in an orderly way without the sudden assault causing not only damage to the doctor's finances and prestige but undoubtedly inconvenience and possibly pain and suffering to the many patients who could not be treated for weeks due to the disruption.

### The Fifth Amendment

Appellants have addressed much of their argument to the point that the use of any of the seized papers would be a violation of their Fifth Amendment rights against self-incrimination. The district court held, in answer to appellants' contention, that such records if seized under a search warrant, would compel them to incriminate themselves, that "the requirement that all individuals subject to tax liability keep accurate financial records is not sufficiently related to the investigation of criminal activity to require the protection of the Fifth Amendment."

Two recent cases are directly apposite to the issue addressed by the District Court. Hill v. Philpott, 445 F.2d 144 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 5 (1971). The facts are strikingly similar to those now before us. A Dr. Hill allegedly kept a set of financial records referred to as "red letter folders" separate and apart from his regular patient records. There, as here, disclosure to the IRS came from the doctor's former employees, who said that they had been instructed by Dr. Hill to incinerate these particular records if any "taxman" sought to make an investigation. Pursuant to a search warrant, agents of the IRS searched both the doctor's office and home, indiscriminatingly seizing as much material as was seized in this case. No criminal proceedings were pending against Dr. Hill. Dr. Hill immediately petitioned for the return of the seized property and its suppression on the ground of violation of his constitutional rights—particularly under the Fourth and Fifth Amendments. The district court denied the petition. On appeal the majority reversed but restricted its opinion to "only the first contention, which is based on the petitioner's privilege against self-incrimination." Then followed a lengthy discussion and review of cases from a Fifth Amendment self-incrimination point of view. Judge Fairchild in dissent, assuming that the seizure was based on an "adequately grounded warrant," wrote that:

> Assuming, however, that there is a class of papers so intimately confidential and so much a part of personhood that they ought to enjoy a superlative privacy and be protected from seizure

upon an adequately grounded warrant, it does not seem to me that the records in question here have the required character. They appear to have been maintained for business and professional purposes, with the knowledge and assistance of employees, and the manner in which they were allegedly kept and used, made them, in a sense, instrumentalities of the tax evasion offense claimed.

Hill v. Philpott, *supra,* was followed in point of time by United States v. Blank, 459 F.2d 383 (1972), in the Sixth Circuit. There the search warrant was executed on June 3, 1971, gambling records were seized on June 15, 1971, and indictment was returned and on August 3, 1971, a motion to suppress was filed. The district court, relying on *Philpott, supra,* granted the motion and held the records to be "per se self-incriminatory." The Court of Appeals vacated the judgment and remanded the case for further proceedings. That court, in reaching this result, said that: "No claim is advanced that there has been any violation of the specific language of the Fourth Amendment" and that since "the papers are not communicative in nature; that papers are business records rather than personal and private writings; and that they are on their face instrumentalities of the crime with which appellant [Blank] is charged" they were subject to seizure under Fourth Amendment search warrant procedures and therefore should not have been suppressed. *Blank, supra,* 459 F.2d at 387. The court rejected "the rationale which underlies the majority decision of the Seventh Circuit [*Philpott*] * * *" and noted Judge Fairchild's dissent in *Philpott* wherein he "concerned himself more with the nature of the evidence under consideration than the method employed to obtain it" (quoting the portion of Judge Fairchild's opinion previously quoted herein).

Nevertheless, it would appear from the *Blank* opinion that the ultimate decision as to admissibility or Fifth Amendment protection had to await such fur-

ther proof as might be adduced upon a trial. Thus, the court said:

> Here, in fact, we have no way of knowing that the instant records are connected with the defendant beyond his counsel's statement in the motion to suppress that they "may be" in his handwriting. This, however, is an important fact upon which the government must at trial bear the burden of proof and upon which, for all we know, there may be strong dispute.

█ In our opinion, appellant's Fifth Amendment contention is premature. Resolution will depend upon facts and developments not before us at this time. As stated, no civil or criminal proceedings are currently pending. When, as and if such proceedings are brought, there will be ample opportunity for the taxpayers to make appropriate objection on Fifth Amendment grounds as the situation may warrant.

Were we to attempt to decide the Fifth Amendment "self-incrimination" problem at this time far more facts would be needed for its resolution. Did the doctor waive these rights by showing Agent Holmes all (except the yellow sheets and green cards) his books? Were the books kept for business purposes with entries made, possibly not by the doctor, but by third persons, actual declarations by and against himself? What instructions, if any, did he give to his employees? What entries, if any, did he personally make? These are but a few of the many questions which may arise. The records might even be placed in a "required records" category. The privilege of practising a profession and gaining income thereby from the public might well not carry with it the shield of Fifth Amendment immunity. If so, both government and appellants will have an opportunity when, as and if the yellow sheets and green cards are offered in any proceeding, criminal or civil, to argue the effect of 26 U.S.C. § 6001.

### Conclusion

The problem here is one of resolving the equities. The government should

not be benefitted in any forthcoming actions against the VonderAhes, civil or criminal, by using books and records illegally seized. On the other hand, the VonderAhes should not benefit from their own acts of concealment and thus avoid the payment of taxes legally due and also the possible consequences of illegal concealment. Our equitable powers would be much distorted were we to hold that the allegedly concealed records (yellow sheets and green cards) were improperly seized.

The VonderAhes have asked us to invoke in their favor what has become known as the "exclusionary rule," i. e., to decree at this time that all records seized, including yellow sheets and green cards and any leads therefrom cannot be introduced in any proceeding, civil or criminal against them. However, if the facts are, as represented, that the taxpayers by their own wrong, deliberately concealed income and failed to pay taxes thereon, it would seem to be the height of inequity for the courts to enable them to profit thereby. Using equity as the standard, the warrants as issued restricted to the yellow sheets and green cards would have been reasonable; beyond these records they were too broad. Although the manner of execution was quite unjustified, the penalty of exclusion which the taxpayers would impose is equally unjustified. Our present task is to place the government's allegedly unlawful procedure in obtaining and executing the warrants and the VonderAhes' allegedly unlawful concealment on the mythical scales of justice, and observe the balance. Observing this balance (or possibly imbalance), we believe that justice can best be achieved by reversing the order of the District Court dismissing the complaint and, upon remand, directing the District Court to grant the injunctive relief sought by appellants except as to the yellow sheets and green cards, copies of which the government may retain and use subject, however, to any and all objections thereto, including objections based on the Fifth Amendment, in any proceeding, civil or criminal, which may be raised by the VonderAhes.

Insofar as the complaint seeks money damages because of the Agents' acts, the serious pecuniary loss caused thereby would appear to bring this case within the *Bivens* doctrine. In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court upheld federal jurisdiction over such a suit and held that money damages may be recovered for any injuries consequent upon a violation of the Fourth Amendment by federal officials. Mr. Justice Harlan in his concurring opinion pointed to the judiciary's "particular responsibility to assure the vindication of constitutional interests such as are embraced by the Fourth Amendment." *Bivens, supra,* at 407, 91 S.Ct. at 2010.

The amended complaint seeks damages of $15,000 for the description of the doctor's practice. Upon the facts set forth, appellants are entitled to have these issues adjudicated. Therefore, the complaint as amended should not have been dismissed.

Order affirmed in part, reversed in part.

ELY, Circuit Judge (concurring in part; dissenting in part):

I concur in my Brother Moore's majority opinion insofar as it condemns, on Fourth Amendment grounds, the overbreadth of the warrant and the absolutely unreasonable scope of the search. I would go further, however, and hold in favor of the appellants as to the so-called yellow sheets and green cards because their seizure, in my opinion, was thoroughly corrupted by the intolerable process under which the search and seizure were conducted. Moreover, I do not retreat from the Fifth Amendment views originally set forth by me and which were originally endorsed by both Judges Moore and Barnes.[1] I note at

---

1. That opinion, which has now been withdrawn, was originally issued in slip form on

March 26, 1973. Its official publication was withheld pending our reconsideration, but it

the beginning that I see no irreconcilable conflict between my original opinion and our court's opinion in United States v. Murray, 492 F.2d 178 (9th Cir. 1973). In our case, the flagrant abuse of the search and seizure process necessitated our judicial disapproval. In *Murray*, on the other hand, despite a substantial question as to whether a certain address book was testimonial, the seizure of the book was properly upheld as resulting from a search incident to a lawful arrest.

Because the original opinion written by me for a unanimous court does not wholly conflict with the present opinion of Judge Moore, no useful purpose would be served by now reproducing the whole of my first opinion. That portion which remains pertinent, and to which I adhere, reads as follows:

As we have said, the appellants contend that the searches and seizures of their books and records violated the privilege against compulsory self-incrimination under the Fifth Amendment. It is clear that had the Government attempted to acquire possession of these records and writings pursuant to a subpoena, appellants would have been privileged under the Fifth Amendment to refuse their production. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886); United States v. Cohen, 388 F.2d 464 (9th Cir. 1967); United States v. Judson, 322 F.2d 460 (9th Cir. 1963). The District Court, however, ruled that the use of a warrant, rather than a subpoena, removed "the impermissible aspect of compulsion" from these seizures. It reasoned that, under the warrant procedure, appellants were "merely passive agents not required to do anything that would tend to be incriminating." No authority was cited for this proposition, but the reasoning is consistent with that recently adopted by our Brothers of the Sixth Circuit in United States v. Blank, 459 F.2d 383, 385 (1972), cert. denied, 409 U.S. 887, 93 S.Ct. 111, 34 L.Ed.2d 143 (1972).

> "We believe that there is a valid and important distinction between records sought by subpoena and records sought by search warrant. The subpoena compels the person receiving it by his own response to identify the documents delivered as the ones described in the subpoena. The search warrant involves no such element of compulsion upon an actual or potential defendant."

*See* 8 J. Wigmore, Evidence § 2264 (McNaughton rev. 1961).

We cannot accept the substantive merit of this approach. One need ask only what would happen if the addressee of a warrant refused to allow the search to be conducted to appreciate the magnitude of compulsion produced by a search warrant. Without the slightest hesitation his doors would be broken down, he would be placed under arrest, and the desired material would be seized. How the imminence of such force can be considered as anything other than compulsion escapes us. In this respect, we are in full agreement with the result reached by our Brothers of the Seventh Circuit as expressed in Hill v. Philpott, 445 F.2d 144, 149 (7th Cir. 1971); cert. denied, 404 U.S. 991, 92 S.Ct. 533, 30 L. Ed.2d 5 (1971), cited with approval in Couch v. United States, 409 U.S. 322,

---

was unofficially published at 31 AFTR 2d 73–1075 (1973).

My original opinion's resolution of the Fifth Amendment issue was approved by at least two law review commentators. *See* Filler, Protecting Your Client: Advice to Accountants and Attorneys, 2 Hofstra L. Rev. 238, 259 n. 578 (1974); Comment, Use of the Summons, Intervention, and Constitutional Rights, 2 Hofstra L.Rev. 135, 177–8 (1974).

I disagree with Judge Moore's position that there is a need for additional development of further factual elements before the need for the application of the Fifth Amendment arises. My reasons, I think, can be sufficiently discerned from the substance of my comments. If the so-called yellow sheets and green cards were not prepared by the doctor himself, it is obvious that any notations thereon could only have been placed by his amanuensis.

330, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

The facts in *Hill* are strikingly similar to those at bar. The affidavits in support of the warrant alleged that a doctor maintained two sets of financial records for two categories of patients and that he had instructed an employee to destroy one set "if any tax man visited the office to make an investigation. . . ." 445 F.2d at 145. The Government, as in the case at bar, argued that because the records were obtained by a search warrant, the only question was whether the warrant complied with the Fourth Amendment.

> "In short, the government takes the position that once the validity of a search is established under the Fourth Amendment—and by that fact alone—the Fifth Amendment is not and cannot be violated."

445 F.2d at 146.

Relying on Boyd v. United States, *infra* and Gouled v. United States, *supra,* the *Hill* court rejected the Government's argument. It read Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), as overruling only *Gouled's* fourth amendment ("mere evidence rule") pronouncements, leaving intact the Fifth Amendment holding that personal books and records are privileged against seizure by search warrant. In such a situation, the *Hill* court pointed out, the accused remains the unwilling source of the evidence:

> "The jury knows the books and records belong to the defendant and the entries he has made therein speak against him as clearly as his own voice. This seems particularly true in a prosecution for violation of the income tax laws."

445 F.2d at 149.

Further, the suggestion that the presence of a search warrant, in and of itself, removes the impermissible aspects of compulsion, is particularly untenable in light of several Supreme Court cases describing the form of compulsion covered under the Fifth Amendment. In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Supreme Court considered a customs statute that required the defendant to produce certain documents upon pain of an adverse finding of fact if he failed to obey. The Supreme Court, considering the Fourth and Fifth Amendments as "almost running into each other," struck down the statute:

> "It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching among his papers, are wanting, and to this extent the proceeding under the act of 1874 is a mitigation of that which was authorized by the former acts; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the fourth amendment to the constitution, in all cases in which a search and seizure would be, because it is a material ingredient, and effects the sole object and purpose of search and seizure."

116 U.S. at 622, 6 S.Ct. at 527–528.

Thus in *Boyd*, the Court found a procedure requiring the production of private books and papers pursuant to a subpoena unconstitutionally compelling despite the fact that ". . . the proceeding in question is divested of many of the aggravating incidents of actual search and seizure . . ." The Court said:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure."

Id. at 635, 6 S.Ct. at 535. *See* Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 379–380, 50 L.Ed. 652 (1906) ("the substance of the offense is the compulsory

production of private papers, whether under a search warrant or a *subpoena duces tecum,* against which the person, be he individual or corporation, is entitled to protection.")

At the very least, *Boyd* suggests that a search for private books and papers is an even more egregious form of compulsion than that *struck down under a subpoena procedure.* That, of course, is the antithesis of the position taken by the District Court in this case. *See also* Wright Federal Practice and Procedure: Criminal, § 665, n. 88 (1969) ("It is much less clear that such a distinction [between the compulsion produced by a subpoena and that produced by a search warrant] *would be sound, or fully consistent with the interests protected by the privilege against self-incrimination*"); Lipton, Search Warrant in Tax Fraud Investigations, 56 A.B.A.J. 941, 943 (1970) ("It is unthinkable that the courts will grant *carte blanche* for the seizure of documents that could not be reached by an administrative or judicial subpoena").

Similarly, in Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L. Ed.2d 908 (1965) (citing *Boyd* with approval) petitioner was hospitalized following an automobile accident. A police officer smelled liquor on petitioner's breath and noticing other symptoms of drunkenness, placed him under arrest. After informing petitioner of his rights, the officer directed the physician to take a blood sample despite petitioner's refusal, on advice of counsel, to consent thereto. A report of the chemical analysis of the blood, which indicated intoxication, was admitted into evidence over objection. On appeal, the Supreme Court upheld the admission of the evidence but said:

"It could not be denied that in requiring petitioner to submit to the withdrawal and chemical analysis of his blood the State compelled him to submit to an attempt to discover evidence that might be used to prosecute him for a criminal offense. He submitted only after the police officer rejected his objection and directed the physician to proceed. The officer's direction to the physician to administer the test over petitioner's objection constituted compulsion for the purposes of the privilege."

384 U.S. at 761, 86 S.Ct. at 1831. *See* Gilbert v. California, 388 U.S. 263, 266–267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967) (holding that the taking of handwriting exemplars is a form of compulsion within the meaning of the Fifth Amendment, but that, "A mere handwriting exemplar, *in contrast to the content of what is written,* like the voice or body itself, is an identifying physical characteristic outside its protection" because it is not the kind of "communication" covered by the privilege) (emphasis added).

Following the reasoning of the court below, and that of the Sixth Circuit, one would have expected the Court in *Schmerber* to hold that there was no "compulsion" involved in the taking of the blood sample. Schmerber was in no way forced to make "assurance, compelled as an incident of the process, that the articles produced are the ones demanded." Wigmore, *supra* § 2264 at 380. Further, the nature of the blood sample taken was such that "the proof of [its] authenticity, or other circumstances affecting [it], may and must be made by the testimony of other persons, without any employment of the accused's oath or testimonial responsibility." *Id.* However, the *Schmerber* Court, as noted above, expressly held that the taking of the blood sample over defendant's objection was "compulsion" within the meaning of the Fifth Amendment.

In the present case, as in *Schmerber* and *Gilbert,* appellants were "passive agents" to these searches through no choice of their own. They repeatedly objected to the searches of their home and office, specifically claiming their constitutional rights, including their fifth amendment privilege. Thus, the search warrants employed in this instance were coercive tools, and it is to-

tally unrealistic to say that they did not involve "compulsion."

Compulsion alone, however, is not enough to constitute a violation of the Fifth Amendment. As noted in *Schmerber*, 384 U.S. at 764, 86 S.Ct. at 1832, "compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture," is not prohibited under the Fifth Amendment:

> "The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

*Id.*

Thus, our inquiry must narrow to a determination of whether the papers, books and records seized in the instant case were "testimonial" or "communicative" in nature such that the accused were forced to bear witness against themselves.

In *Schmerber*, the Court expressly noted that " . . . compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers . . .," is within the fifth's privilege. 384 U.S. at 764, 86 S.Ct. at 1832. One year after *Schmerber* was decided, the Court overruled the long criticized "mere evidence" rule of Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), and upheld the admission of certain evidence despite petitioner's Fifth Amendment claims. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *see also* 18 U.S.C. § 3103a (authorizing the issuance of a warrant "to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States"). The objects seized in *Hayden* were trousers, a jacket and a cap, items previously immune from seizure under *Gouled*. The Court's opinion, however, contained a significant caveat:

> "The items of clothing involved in this case are not 'testimonial' or 'communicative' in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment. Schmerber v. State of California, 384 U.S. 757 [86 S.Ct. 1826, 16 L.Ed.2d 908]. This case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure."

387 U.S. at 302–303, 87 S.Ct. at 1648. *See* note accompanying the recent amendments to the Federal Rules of Criminal Procedure, 48 F.R.D. 629–630 (1970) (disclaiming any intention to abrogate the protection of the Fifth Amendment against self-incrimination and stating that, "items which are solely 'testimonial' or 'communicative' in nature might well be inadmissible on those grounds.")

Further light was cast upon the meaning of the phrases "testimonial" and "communicative" in *Schmerber* when the Court noted, in dictum, that the results of a compelled lie detector test would be "testimonial" for the purposes of the Fifth Amendment, notwithstanding the fact that such tests are seemingly directed towards the elicitation of "physical evidence." 384 U.S. at 764, 86 S.Ct. 1826. In contrast, California v. Byers, 402 U.S. 424, 431–433, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), held that it would be an "extravagant" extension of the privilege to apply the Fifth Amendment to a California statute declaring it illegal for a motorist to fail to stop after an accident and to furnish his name and address. The Court held that the requirement of stopping is no more testimonial than requiring a person in custody to speak or walk and that the disclosure requirement is an essentially neutral, nontestimonial act. *See* United States v. Wade, 388 U.S. 218, 222–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (requiring

an accused to exhibit his person to prosecution witnesses at a police lineup involved " . . . no compulsion of . . . testimonial significance"); Gilbert v. California, 388 U.S. 263, 266–267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967) ("A mere handwriting exemplar, *in contrast to the content of what is written,* like the voice or body itself, is an identifying physical characteristic outside its [Fifth Amendment] protection. . . .") (emphasis added).

In the case here, the books and writings seized under warrant included items on which appellants alone, rather than any third party, made entries. The 30 page description in the Government's inventory of seized items runs the gamut from personal checks to insurance applications, and includes almost anything that had writing on it. The list includes, for example: a map of Bull River, Sanders, Montana; several personal letters; approximately 67 pages of "miscellaneous notes;" business cards; sheets of paper with names but no dates; three pages of survey information on Montana property; miscellaneous sheets of paper "with figures appearing;" a rental contract from U-Haul; appointment books; an envelope containing "employment forms;" "letters of correspondents relative to the purchase of property;" and "design estimates.";

The scope of these searches went well beyond a perscrutation for "real or physical evidence." The Internal Revenue Agents were obviously looking for writings that would bespeak appellants' guilt, and, indeed, they may have found them. The numerous sheets of notes, figures and estimates, and the several letters of correspondence are the kind of "communicative act or writing" that would reflect the author's personal thoughts, opinions and conclusions. Schmerber v. California, *supra.*

Finally, the testimonial compulsion levied against these appellants violated that "private inner sanctum of individual feeling and thought" which the Fifth Amendment seeks to protect. Couch v.

United States, 409 U.S. 322, 327, 93 S. Ct. 611, 615, 34 L.Ed.2d 548 (1973). The subject records were clearly in the possession, not to mention the ownership, of the appellants at the time of their seizure and "possession bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment." *Id.* at 331, 93 S.Ct. 617. Thus, these records were protected from seizure by the Fifth Amendment.

I would reverse the District Court's Order in its entirety, directing that the injunction sought by the appellants be granted.