777 F.2d 1363
 UNITED STATES of America, Plaintiff-Appellee,
v.
STORAGE SPACES DESIGNATED NOS. "8" AND "49" LOCATED AT 277
EAST DOUGLAS, VISALIA, CALIF., Defendant,
and
Nescco, Inc., Real Party in Interest-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
560 SOUTH BRIDGE STREET, VISALIA, CALIFORNIA, Defendant,
and
Balarama's Enterprises, Inc., Real Party in Interest-Appellant.
 Nos. 85-1085, 85-1086.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 11, 1985.
Decided Dec. 3, 1985.
 
 Edward P. Moffatt and Ivan Abrams, Asst. U.S. Attys., Fresno, Cal., for plaintiff-appellee.
 David F. Rodriquez, Isham, Macias, Lynch, Cronin & Rodriguez, and Jay W. Powell, Powell & MacGlashan, Visalia, Cal., for real party in interest-appellants.
 Appeal from the United States District Court for the Eastern District of California.
 Before CHOY, Senior Circuit Judge, HUG and SCHROEDER, Circuit Judges.
 CHOY, Senior Circuit Judge:
 
 
 1
 Food and Drug Administration ("FDA") Inspector Anderson presented to a magistrate two identical 16-page affidavits relating information he had derived from his investigation of appellants Balarama's Enterprises, Inc. ("Balarama's") and NESCCO, INC. ("NESCCO"). The magistrate issued two search warrants, one for Balarama's' main office at 650 South Bridge St., Visalia, California, and the other for NESCCO's leased storage spaces, numbers 8 and 49, at 727 East Douglas, Visalia, California.
 
 
 2
 Both warrants designated the same fifteen items to be seized, including fourteen different allegedly misbranded drugs, each having a different commercial name. The fifteenth item was a catchall provision seeking all other drugs, labeling for drugs, paperwork relating to drugs (orders, records, checks and correspondence), and other articles evidencing violations of 21 U.S.C. Sec. 331(a) & (k). This statute, in general, prohibits the misbranding of drugs that have been or will be in interstate commerce.[1]
 
 
 3
 The search warrants were executed and a substantial quantity of drug material and documents was seized. Appellants jointly filed a motion for return of property and suppression of evidence, contending that there was no probable cause to support the warrants and that item 15 of the warrants was overbroad. Stating that the request for suppression was premature because no criminal proceedings were pending against appellants, the district court rejected appellants' motion for return of property by upholding the validity of the search warrants. Both appellants timely filed a notice of appeal from this decision and their appeals were consolidated.
 
 ISSUES
 
 4
 1) Is the district court's denial of appellants' motion for return of property and suppression appealable?
 
 
 5
 2) Was there probable cause to support the issuance of the two search warrants?
 
 
 6
 3) Did the search warrants describe the items to be seized with sufficient particularity?
 
 
 7
 1) Appealability of Denial of Motion for Return of Property and Suppression
 
 
 8
 We must first consider the jurisdictional question of whether the district court's order denying appellants' motion is a final decision.[2]
 
 
 9
 In DiBella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962), the Supreme Court declared that a denial of motion to suppress is appealable "[o]nly if the motion is solely for return of property and is in no way tied to a criminal prosecution in esse against the movant." Id. at 131-32, 82 S.Ct. at 660. The Supreme Court identified those instances when an order granting or denying a motion for suppression of evidence is interlocutory:
 
 
 10
 When at the time of ruling there is outstanding a complaint, or a detention or release on bail following arrest, or an arraignment, information, or indictment--in each such case the order on a suppression motion must be treated as "but a step in the criminal case preliminary to the trial thereof." Cogen v. United States, 278 U.S. 221, 227, 49 S.Ct. 118, 120, 73 L.Ed. 275.
 
 
 11
 Di Bella, 369 U.S. at 131, 82 S.Ct. at 660.
 
 
 12
 In interpreting the DiBella rule, this court has been consistent in its treatment of appeals seeking review of orders granting or denying motions that seek the return of property: if there is a criminal proceeding pending, this court lacks jurisdiction because the order is interlocutory, United States v. Woodson, 490 F.2d 1282, 1283 (9th Cir.1973); Meier v. Keller, 521 F.2d 548, 556 (9th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); if there is no criminal prosecution pending against the movant, the order on the motion for the return of property is final and, hence, appealable. VonderAhe v. Howland, 508 F.2d 364, 368 (9th Cir.1974); Goodman v. United States, 369 F.2d 166, 168 (9th Cir.1966). Although the discussion in Woodson and Meier appears to place some stress on the fact that the motion sought suppression as well as return of property, in both cases, a criminal action was pending. The VonderAhe opinion makes it plain that it is the pendency of the criminal action that is the determining factor, not the form of the motion, which is in accord with the earlier Goodman opinion. This is also in accord with the Supreme Court's statement in United States v. Ryan, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971). There, the Court, in reference to DiBella, stated:
 
 
 13
 We have thus indicated that review is available immediately of a denial of a motion for the return of seized property, where there is no criminal prosecution pending against the movant.
 
 
 14
 Here, there is no criminal proceeding pending. In fact, the district court noted that because no criminal proceedings were in esse, it would not consider appellants' motion as one to suppress. As such, the district court was confronted solely with a motion for the return of property. As there was no criminal prosecution pending, we have jurisdiction to review the district court's order denying appellants' motion for the return of property.
 
 
 15
 2) Probable Cause to Support Issuance of Warrants
 
 
 16
 The standard for review of a magistrate's probable cause determination is whether the magistrate "had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). There are essentially two elements involved: evidence that a crime has occurred, and evidence that the place to be searched contains evidence of that crime. See United States v. Federbush, 625 F.2d 246, 252 (9th Cir.1980). A magistrate's finding of probable cause should be given "substantial deference." United States v. Flores, 679 F.2d 173, 176 (9th Cir.1982), cert. denied, 459 U.S. 1148, 103 S.Ct. 791, 74 L.Ed.2d 996 (1983).
 
 
 17
 A) Evidence of Violations of Sec. 331(a) & (k)
 
 
 18
 Inspector Anderson's affidavit provides ample evidence that appellants had violated 21 U.S.C. Sec. 331(a) & (k).[3] In this case, there are three relevant components to such violations, each having been attacked by appellants. 1) The articles must be drugs. 21 U.S.C. Sec. 352. 2) The drugs must be misbranded; that is, they must meet one of the numerous Sec. 352 definitions of misbranded. 3) And they must be sufficiently connected to interstate commerce. 21 U.S.C. Sec. 331(a) & (k).
 
 
 19
 i) The Articles are Drugs
 
 
 20
 The term "drug" includes "articles (other than food) intended to affect the structure or any function of the body of man." 21 U.S.C. Sec. 321(g)(1)(C) (1982).[4] The vendor's intent is the key element in this statutory definition. Cf. National Nutritional Foods Ass'n v. Mathews, 557 F.2d 325, 333 (2d Cir.1977). This intent may be derived or inferred from labeling, promotional material, advertising, or any other relevant source. Id. at 334.
 
 
 21
 Anderson's affidavit strongly indicates that appellants promoted and intended their products to be used as cocaine substitutes. The general manager of Balarama's had admitted to Anderson in 1982 that the firm sold cocaine substitutes. In June of 1983, the State of California enjoined Balarama's from manufacturing, packaging, marketing, selling or distributing Benzocaine, Lidocaine, Tetracaine, and Procaine, anesthetic drugs often diverted to illegal use as cocaine substitutes.
 
 
 22
 Upon his arrest for possession of cocaine, William Bowes, an employee of Balarama's, was found with approximately 2000 leaflets entitled "Cocaine," each stating that the product advertised was a synthetic and was selling for 25% off the street price. The flyer contained directions for mailing an order to Balarama's.
 
 
 23
 The items seized, listed in Balarama's' catalogs and advertisements as incense, had commercial names which suggest to persons interested in using cocaine or cocaine substitutes that the items are similar to or related to cocaine. Anderson's affidavit also quoted a medical journal article noting that cocaine substitutes are often promoted as incense. Some of the products were labeled with the words "if ingested or inhaled, may cause stimulation," which suggests that the products could produce stimulation, as cocaine does.[5]
 
 
 24
 Dr. Tocus, Chief of the Drug Abuse Staff of the FDA's Center for Drugs and Biologics for the last decade, and expert advisor to numerous federal and state governmental entities dealing with drug abuse, was quoted in Anderson's affidavit as saying that the various "incense" products distributed by Balarama's contain drug ingredients and are labeled, promoted, and distributed in a manner which suggests that they are intended by Balarama's to be used as drugs within the meaning of 21 U.S.C. Sec. 321(g)(1).[6]
 
 
 25
 The various items of evidence strongly suggest that appellants were distributing "drugs" within the meaning of Sec. 321(g)(1)(C).
 
 
 26
 ii) The Drugs were Misbranded
 
 
 27
 A drug is misbranded under 21 U.S.C. Sec. 352(f)(1) if its label lacks adequate directions for use. The items seized contained no directions at all regarding how to use them as drugs.[7] They thus clearly fail to provide the required "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 CFR Sec. 201.5 (1985). Even if they are prescription drugs, they do not meet the regulatory prerequisites, under 21 CFR Sec. 201.100, for exemption from the requirement that labels bear adequate directions for use.[8]
 
 
 28
 A drug is also misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. Sec. 352(a). Because the products are labeled as "incense," when it appears that they are, in fact, intended for drug use, there is a reasonable basis for believing that the labeling is false and misleading.
 
 
 29
 Finally, a drug is misbranded if it contains two or more ingredients and the label fails to contain the name of each active ingredient. 21 U.S.C. Sec. 352(e)(1)(A)(ii). Some of appellants' products contain more than one ingredient (e.g. Pseudo-Scent), yet their labels fail to identify all active ingredients.[9]
 
 
 30
 iii) Interstate Nexus
 
 
 31
 Agent Piekarski of the FDA's Reno, Nevada post placed orders with Balarama's for some of the suspected cocaine-substitute drugs. Balarama's shipped some of those products to Piekarski via United Parcel Service from Balarama's' California address to Nevada. Such interstate shipments clearly meet the "introduction ... into interstate commerce" requirement. 21 U.S.C. Sec. 331(a).
 
 
 32
 In addition, during an FDA inspection of an Indiana company that apparently was repacking drugs for sale as cocaine substitutes, inspectors found a bottle of Lidocaine bearing the name Northeast Siberian Chemical Company (a/k/a NESCCO). The operator of the company said the order for the Lidocaine was placed with Balarama's in California.
 
 
 33
 The evidence supports the conclusion that Balarama's marketed and distributed many of their misbranded products out of state.
 
 
 34
 B) Evidence that Items Sought by Search Warrant would Likely be Found at Balarama's Main Facility and in NESCCO's Leased Storage Spaces
 
 
 35
 We have ruled that the affidavit must only "enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit." United States v. Hendershot, 614 F.2d 648, 654 (9th Cir.1980) (a stricter "more-likely-than-not" standard is not proper).
 
 
 36
 We need not resort to the evidence uncovered by Agent Anderson's pre-search inspection of NESCCO's leased storage spaces (mentioned in Anderson's affidavit) to conclude that it was very reasonable to seek the incriminating items at Balarama's' main facility at 650 South Bridge Street and at NESCCO's leased storage spaces at 727 East Douglas. Therefore, we need not resolve the issue of whether or not the inspection was conducted in conformity with 21 U.S.C. Sec. 374 and the fourth amendment.[10]
 
 
 37
 As discussed above, the Anderson affidavit contains abundant evidence suggesting that Balarama's was involved in the interstate distribution of misbranded drugs. The affidavit demonstrates that Balarama's' main operating location was 650 South Bridge Street, Visalia, California, and that its inventory of products was stored there. It was thus quite reasonable to seek the drugs and other evidence of Sec. 331 violations at Balarama's' 650 South Bridge Street facility.
 
 
 38
 Evidence presented in the affidavit indicates that NESCCO was an alter ego of Balarama's and participated in the shipping of drugs to Agent Piekarski and other buyers. Balarama's originally used a storage warehouse on South Lovers Lane in addition to the main plant on South Bridge Street, but subsequently vacated those premises. A vehicle used to move the goods out of the warehouse was seen stopping at 727 East Douglas.
 
 
 39
 Agent Anderson discovered that storage spaces 8 and 49 at 727 East Douglas were leased in the name of NESCCO, with the lessee giving 650 Bridge Street as its address and a telephone number that matched that of Balarama's. Two persons authorized to enter the storage units were employees of Balarama's. Apparently, Balarama's had moved their goods out of the South Lovers Lane warehouse and into storage spaces 8 and 49 at 727 East Douglas. It was thus reasonable to seek the drugs and other evidence of Sec. 331 violations at those storage spaces.
 
 
 40
 3) Did the Search Warrants Describe the Items to be Seized with Sufficient Particularity?
 
 
 41
 A warrant must only be "reasonably specific, rather than elaborately detailed, in its description of the objects of the search." United States v. Brock, 667 F.2d 1311, 1322 (9th Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983). Because there is no indication that Anderson's affidavit was attached to or otherwise accompanied the search warrants, we cannot look to it to provide particularity. In the Matter of Seizure of Property Belonging to Talk of the Town Bookstore, Inc., 644 F.2d 1317, 1318-19 (9th Cir.1981).
 
 
 42
 Items 1-14 in the search warrants consist of fourteen different items which might be drugs identified by the names given in a Balarama's catalog sent to Agent Piekarski.[11] Such descriptions are obviously sufficiently particularized. Our real concern centers on item 15, which includes all other drugs, labels for drugs, orders and checks for drugs, records and correspondence relating to purchases, sales, packing and distribution of drugs; and other fruits and instrumentalities of crimes which are evidence of violation of, or in violation of, 21 U.S.C. Sec. 331(a) and (k).
 
 
 43
 A review of Ninth Circuit cases indicates that the question of whether item 15 is sufficiently particularized is a close one. The description includes practically all paperwork (records, orders, checks, correspondence) relating to drugs, all drugs and labels for drugs, and other "fruits and instrumentalities of crimes," the only explicit limitation being that the material be evidence of a violation of 21 U.S.C. Sec. 331(a) and (k). We have stated that " 'limiting' the search to only records that are evidence of the violation of a certain statute is generally not enough." United States v. Cardwell, 680 F.2d 75, 78 (9th Cir.1982). Cardwell noted that where a statute provides the only limitation on a search, the executing officers are forced to interpret the statute in limiting their search, a task they may be unqualified to perform. Id. Instead, "the warrant must contain some guidelines to aid the determination of what may or may not be seized." Id. Item 15 does not provide any guideline at all.
 
 
 44
 Other than the statutory limitation, the only express limit on the scope of the search is that the seized material have some connection with drugs. This is obviously not a significant limitation because the statute itself already encompasses that limitation. See 21 U.S.C. Sec. 352.
 
 
 45
 The government tries to distinguish Cardwell by noting that the statute involved in Cardwell was the very general tax evasion statute, 26 U.S.C. Sec. 7201, which makes it a crime for a person to willfully attempt to evade any tax imposed by Title 26. Here the limiting statute is 21 U.S.C. Sec. 331(a) & (k), concerning the misbranding of items involved in interstate commerce. The government contends that because this statute is more specific than the tax evasion statute it provides sufficient particularity. This claim must be rejected.
 
 
 46
 We have held that statutes at least as specific as the misbranding statutes did not sufficiently limit the scope of a search warrant. In United States v. Crozier, 674 F.2d 1293, 1299 (9th Cir.1982), vacated on other grounds, --- U.S. ----, 104 S.Ct. 3575, 82 L.Ed.2d 873 (1984), for example, we held that a warrant which authorized the seizure of "material evidence of violation of 21 U.S.C. Sec. 841," which prohibits the manufacture and possession of amphetamine with intent to distribute, was not sufficiently particularized. See also United States v. Whitten, 706 F.2d 1000, 1014 (9th Cir.1983) (warrant authorizing search for "evidence of narcotics trafficking" is overbroad), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).
 
 
 47
 Nevertheless, had the government limited the description in item 15 description to include labeling and other paperwork relating only to those drugs listed in items 1-14, the warrant would unquestionably have been sufficiently particularized. Cf. Andresen v. Maryland, 427 U.S. 463, 480-82, 96 S.Ct. 2737, 2748-49, 49 L.Ed.2d 627 (1976) (warrant description limiting search to evidence of crime involving particular lot is sufficiently particularized); Cardwell, 680 F.2d at 77 (distinguishing Andresen). But item 15 did not impose such a limitation because it was meant to cover other drugs (and labeling and paperwork relating to them) not mentioned in items 1-14. Thus, some guidelines were needed to assist the officers in distinguishing other appropriate drugs from irrelevant material. As already noted, the statutory limitation by itself was not a sufficient guideline.
 
 
 48
 On the other hand, item 15 cannot be read in a vacuum and must instead be construed in light of the presence of items 1-14. Because items 1-14 provide a sample of names of suspected misbranded drugs, we believe that they implicitly limited item 15's otherwise unbounded reference to all other drugs (and labeling and paperwork relating to drugs) to only those drugs with names of the same nature as those identified in items 1-14. The names of the drugs given in items 1-14 aided the executing officers in determining whether any particular drug material (or paperwork relating to drugs) they came upon was similar to items 1-14 and thus was likely to be similarly misbranded.
 
 
 49
 Therefore, the listing of items 1-14 in the warrant provided an important guideline limiting the otherwise overbroad item 15 description. It is true that this limitation is not a very precise one, as the officers still had to decide whether any particular chemical or commercial name was of the same nature as those given in items 1-14. It is doubtful, however, that a much more precise description could have been given.
 
 
 50
 In Cardwell, we stated that "[o]ne of the crucial factors to be considered is the information available to the government. '[G]eneric classifications in a warrant are acceptable only when a more precise description is not possible.' " Cardwell, 680 F.2d at 78 (quoting United States v. Bright, 630 F.2d 804, 812 (5th Cir.1980) ); see also VonderAhe v. Howland, 508 F.2d 364, 369-70 (9th Cir.1974). The Cardwell decision was based in part on the fact that, prior to its warrant request, the government had known exactly what it needed and where the records were located. There was thus no necessity for the warrant's broad wording which effectively allowed a re-examination of all of Cardwell's accounting records. Cardwell, 680 F.2d at 78; see also United States v. Gomez-Soto, 723 F.2d 649, 654 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984).
 
 
 51
 In our case, however, to the extent that the government sought evidence of misbranding involving drugs not listed in items 1-14, with a few minor exceptions, the government did not have information allowing it to specify the precise names of other potentially misbranded drugs. Thus, other than the listing of the drug names provided in items 1-14, it is not clear how the warrant could have provided any additional guidance to help the officers determine whether a particular material was a "drug" and was likely misbranded.
 
 
 52
 Considering the information provided in the affidavits, it appears that a list of the chemical names and street-slang terminology often associated with cocaine or cocaine substitutes would have given the best possible guidance. Anderson's affidavit discussed the cocaine-related chemicals (lidocaine, procaine, etc.) and the cocaine street-slang terminology. Because the affidavit did not accompany the warrant, however, we cannot rely upon it. See Talk of the Town Bookstore, supra. Nevertheless, we hold that the presence of items 1-14 in the warrant provided essentially the same information by giving examples of relevant chemical names and street-slang terminology.
 
 
 53
 Although admittedly a close question, we conclude that item 15, viewed in the context of the rest of the warrant, was sufficiently particularized. The district court's decision upholding the validity of the search warrants and denying appellants' motion for return of property is AFFIRMED.
 
 
 
 [1]
 21 U.S.C. Sec. 331 provides:
 "The following acts and the causing thereof are prohibited:
 (a) The introduction or delivery for introduction into interstate commerce of any ... drug ... that is ... misbranded.
 * * *
 (k) ... the doing of any ... act with respect to, a ... drug ..., if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being ... misbranded.
 
 
 [2]
 The government purported to concede jurisdiction at oral argument. Since subject-matter jurisdiction cannot be conceded, see Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982), however, we address that issue here
 
 
 [3]
 Contrary to appellants' assertion, both Affidavits for Search Warrants did incorporate Inspector Anderson's affidavit
 
 
 [4]
 Appellants' contention that the Sec. 321(g)(1) definition of "drug" involves a conjunctive test is frivolous
 
 
 [5]
 The fact that the items were called "incense" and advertised as "Not for drug use" cannot be controlling on the issue of whether they are drugs. Where, as here, the items are otherwise promoted and advertised in ways that suggest they are cocaine substitutes, appellants' intent in distributing the products is clear. Self-serving labels cannot be allowed to mask the vendor's true intent as indicated by the overall circumstances. See National Nutritional Foods, 557 F.2d at 334
 
 
 [6]
 Thus, contrary to appellants' assertion, the government does not rely on evidence of consumer use alone to establish the appellants' intended use. Instead, the government relies primarily on the manner in which the products are promoted and advertised
 
 
 [7]
 This is probably partly a result of their being advertised as "incense" and "Not for drug use." However, if, as we concluded above, the items are intended to be used as drugs, Sec. 352(f)(1) requires that they contain adequate directions for use as drugs
 
 
 [8]
 Appellants' reliance on United States v. Evers, 643 F.2d 1043 (5th Cir.1981), is misplaced. Evers merely held that a doctor could not be guilty of failing to provide his patients with adequate directions for use of prescription drugs, because prescription drugs, by definition, can only be used under a physician's supervision; thus, it is impossible to provide adequate directions to laymen regarding the use of prescription drugs. 643 F.2d at 1050-51. Because appellants are not physicians distributing their products to their patients, Evers is inapplicable
 
 
 [9]
 The government also contends that the products are misbranded in that they are "imitation[s] of another drug." 21 U.S.C. Sec. 352(i)(2). Although we need not resolve this issue in light of the sufficiency of the other misbranding violations already discussed, we find the government's contention to be questionable. The intent of Sec. 352(i)(2) is to prevent drug distributors from "passing an imitation off as the original." United States v. Generix Drug Corp., 460 U.S. 453, 459 n. 9, 103 S.Ct. 1298, 1302 n. 9, 75 L.Ed.2d 198 (1983). Although there is strong evidence that appellants' products are being offered as cocaine substitutes, see supra, there is little evidence that appellants are trying to pass their products off as cocaine, itself. There is no deception involved for it appears that appellants are trying to pass their products off for exactly what they are, cocaine substitutes
 
 
 [10]
 It appears that the inspection was not authorized because Anderson did not present his credentials and notice of inspection to the lessee of the storage spaces, NESCCO, but only to the manager of the lessor, Rent-A-Space. Although 21 U.S.C. Sec. 374 does not clearly indicate which party in a lessor-lessee situation must be presented with the credentials and notice, logic suggests that it is the lessee, as it is his privacy which is being invaded. Cf. Stoner v. California, 376 U.S. 483, 489, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964) (only hotel guest or his authorized agent, not hotel owner or his agent, may consent to search of guest's room). There is no indication that NESCCO authorized Rent-A-Space to permit the FDA to inspect its leased storage spaces
 
 
 [11]
 Each of items 1-14 read, "Powder, crystalline, or other material identified as" followed by one of these names: Base-O-Scents (Base-O-Caine), Bolivian Rock, Close Enough, De Blanco, Peruvian Flake, Pseudo Scents (Pseudocaine), Real Scents (Real Caine), Rock Crystal, Super Flake, Superior B, Super Scents (Supercaine), Supertoot, Toot Scents (Toot), and Ultra Scents (Ultra-Caine)
 Although item 12, "Supertoot," was not listed in the catalog, Piekarski had placed a telephone order for Supertoot with Balarama's.