**William E. JONES and Gladys A. Jones and Acme Meat Company, Inc., Petitioners,**

v.

**Prescott A. BERRY, et al., Respondents.**

**Civ. No. 81–581 PHX VAC.**

United States District Court, D. Arizona.

Oct. 20, 1981.

---

Stephen E. Silver, Burch & Cracchiolo, P. A., Phoenix, Ariz., for petitioners.

Ralph A. Romano, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., Michael *f* Johns, Asst. U. S. Atty., Phoenix, Ariz., for respondents.

## OPINION AND ORDER

CORDOVA, District Judge.

### INTRODUCTION

Petitioners were targets of an undercover operation conducted by the Internal Revenue Service (IRS). Prior to the institution of any criminal proceeding, petitioners filed a petition seeking the return and future suppression of certain evidence seized by the IRS agents. For the reasons hereinafter stated, the Court will grant the relief requested in the petition.

### FACTS

In May of 1977 respondent John M. Manning, a Special Agent with the IRS, submitted a request for approval of the Business Opportunities Project (BOP). The objective of the BOP is to discover tax fraud by the use of IRS Special Agents acting in an undercover capacity as prospective purchasers of businesses for sale. The Agents would attempt to gain the confidence of the seller in order to elicit evidence of "skimming", the understatement of income, by the seller.

The BOP was approved by the District Director and went into effect as a local District project on June 2, 1977. Respondent David C. Arnell, Phoenix District Chief of the Criminal Investigation Division, then submitted a request for national approval of the program, which was initially denied on January 21, 1978 by the National Director of the Intelligence Division (now the Criminal Investigation Division). After the project was reclassified as a "quasi, non-penetration undercover approach" rather than as a deep penetration undercover technique which requires national approval, the National Director authorized the BOP on January 23, 1981. (Exhibit 18).

On January 10, 1981 Special Agent Manning visited Business World Investments, Inc. and represented to sales representative Frank Bornstein that he and a partner were interested in purchasing a business in the Phoenix area. Manning stated that he was originally from Springfield, Massachusetts and presented the business card of "J. Manning and Assoc." (Exhibit 1). Although the term "skimming" may not have been used at this initial meeting, Manning indicated by veiled suggestions and hand gestures that he was interested in businesses with a substantial cash flow susceptible to skimming. Without mentioning the name of the company, and without discussing whether skimming was actually occurring, Bornstein responded that he had previously listed a meat company which might suit Manning's purposes.

After lining up a single party listing for petitioner Acme Meat Company in favor of Manning, Bornstein met again with Manning on February 7, 1981 and disclosed that the meat business was named Acme Meat Company. Manning signed a confidentiali-

ty agreement promising not to divulge information about Acme Meat to others, except to secure their advice and counsel. (Exhibit 2). Manning then scanned the corporate tax returns for Acme Meat for the fiscal years 1976, 1977 and 1978 which were given to him by Bornstein.

Bornstein and Manning then went to the premises of Acme Meat where Manning toured the business and met petitioner William E. Jones. Manning raised the subject of skimming to Jones while they were temporarily outside the presence of Bornstein. Though the conversation was conducted in somewhat vague terms, Manning testified that it was his impression, as a result of an "informal meeting of the minds," that Jones was skimming.

On February 18, 1981 Bornstein contacted Manning by telephone and asked: "Are you sure you are not from the IRS?" Manning testified that he just laughed, said nothing, and proceeded to arrange for another meeting with Jones.

On the morning of April 4, 1981 Manning met with Bornstein, William Jones and his wife, Gladys, who is also a petitioner in this case, at the Joneses' Pinchot residence. Manning reviewed various corporate books and records, including sales invoices and the cash receipts and disbursements ledger for the fiscal year 1981, certain fiscal year 1980 business records, as well as the general corporate ledger.

Manning arranged to have his supposed business partner, Special Agent James E. Mason, a respondent herein, meet the Joneses to further consider the purchase of the business. Manning and Mason decided that Manning would feign interest in buying the business, while Mason would be reluctant and take a "show me" attitude. Manning and Mason toured the premises of Acme Meat with Mr. Jones on April 25, 1981. At the insistence of Manning, Bornstein did not attend this meeting. With the admitted intent of viewing petitioners' records the agents again stated that they were only interested in purchasing a business that could generate substantial skimming and Mr. Jones then agreed to show them the records of the skim which were located at his home.

Upon arriving at the Joneses' Pinchot residence the agents noted a sign that the home was for sale. The agents asked for and were granted a tour of the house by Mr. and Mrs. Jones on the pretext that Mason knew someone who might be interested in purchasing it. Manning testified that in fact a purpose of the tour was to allow them to prepare a diagram of the house in order to obtain a search warrant.

The agents and the Joneses then went into the kitchen where certain books and records were on display. In response to Mason's request for proof of skimming, Mrs. Jones removed a five by six inch paper from a file cabinet in the kitchen. Mason expressed doubt as to the validity of the monthly and yearly totals on the paper and asked for documentation to substantiate the figures, selecting at random the month of February, 1977 for a sample audit. The Joneses lead the agents to their bedroom where Mrs. Jones removed the February, 1977 skimmed invoices from the top left drawer of their dresser. After returning to the kitchen, Mrs. Jones reconciled precisely the figure entered on the summary sheet by adding the invoice totals on a calculator. Mason then assisted Mrs. Jones in returning one of the corporate ledgers to another bedroom where Mason noted the location of other books and records.

Within a few days after this April 25, 1981 meeting Manning drew a diagram of the Pinchot residence and prepared a search warrant affidavit. A raid plan for the search was prepared by Special Agent David McCluskey. On the morning of May 1, 1981 a search warrant was issued by a United States Magistrate. (Exhibit 6). The agents assigned to execute the search met at the IRS offices where a copy of the search warrant was briefly circulated among the agents. The search warrant listed five specific items to be seized, and Manning instructed the agents as to the location of each item by means of the diagram included in the raid plan.

The search began at approximately 11:40 a. m. on May 1, 1981 when Special Agents McCluskey and Laura Brown announced to Mrs. Jones that they were real estate agents interested in viewing the premises. They followed Mrs. Jones into the kitchen where the agents displayed their badges and announced that they were there to execute a search warrant, which may have been shown to Mrs. Jones at this time. Mrs. Jones was read her constitutional rights and declined the opportunity to telephone her husband or an attorney. Mrs. Jones was asked for consent to search the storage buildings behind the house and she responded that the records had been moved from the storage buildings to the Joneses' new residence on Rowland Lane. Mrs. Jones then read and signed consent forms to allow the search of the storage buildings and the Rowland Lane residence. Agent Brown remained with Mrs. Jones in the living room watching television during the search.

The search of the Pinchot residence was executed by approximately nine agents by means of a "search and finder" system. Agents were assigned to search a specific area and raid leader McCluskey was to review items brought to him by the other agents to determine whether they were subject to seizure. McCluskey testified that his review of the items presented during the hour and ten minutes search was cursory and he admitted that many items were improperly seized. It appears that with one exception[1] every item presented to McCluskey was tagged and seized. Approximately eight boxes of records were seized at the Pinchot residence. Mrs. Jones was presented with a copy of the search warrant which included an inventory summary of the items taken. Agents McCluskey and Brown then proceeded to the Rowland Lane

residence where an additional eight boxes of records were seized.

At approximately 4:30 p. m. on May 1, Mr. Jones telephoned respondent Bernice Yost, Group Manager of the Criminal Investigation Division, and demanded the return of all of the records and stated they were needed for the operation of the business. Ms. Yost replied that certain items would be returned and on May 4 an adding machine and a blank checkbook were returned to the Joneses.

On May 6 the Joneses' attorney presented to Ms. Yost a written request for the return of all records. Ms. Yost did not fully comply with this request, however, and on May 7 merely returned blank business forms, an address book, a file cabinet, and various fiscal year 1981 records. (Exhibits 11, 12). The IRS has retained possession of the bulk of the seized records (Exhibits 15a, 15b, 15c) and has microfilmed many of the documents.

Petitioners filed a petition and an amended petition on May 27, 1981 seeking the return and suppression of the seized records, and requesting a temporary restraining order preventing respondents from proceeding with their investigation of petitioners stemming from evidence obtained as a result of the searches and seizures on April 4, April 25 and May 1, 1981. The Court issued a temporary restraining order on June 10, 1981. Respondents filed a motion to dismiss which was denied by the Court on June 25 following oral argument. An evidentiary hearing was held on July 10 and July 14, 1981.

## DISCUSSION

In ruling on the motion to dismiss the Court determined that it had jurisdiction under Rule 41(e)[2] of the Federal Rules of

---

1. The agent refused to seize wrapped wedding gifts.

2. Rule 41(e) provides:

Motion for Return of Property. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return

of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial

Criminal Procedure and on the basis of its inherent equity powers. *See G. M. Leasing Corp. v. United States*, 429 U.S. 338, 360, 97 S.Ct. 619, 632, 50 L.Ed.2d 530 (1977). At the time of the evidentiary hearing the respondents conceded and the Court finds that petitioners have shown sufficient irreparable injury to support such jurisdiction in this matter. *See id: Hunsucker v. Phinney*, 497 F.2d 29, 34 (5th Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).

Petitioners raise several arguments in support of their Rule 41(e) request for the return and suppression of the seized records. They contend that the April 4 and April 25 meetings with the agents constituted illegal warrantless searches. They then argue that the May 1 search and seizure at the Pinchot residence was invalid under the fruit of the poisonous tree doctrine. This latter argument is that the search warrant was tainted by the affidavit which contained facts learned as a result of the prior unconstitutional searches.

Petitioners also maintain that all of the Pinchot evidence should be suppressed and returned on the ground that the search warrant was executed in an unreasonable manner and because the agents failed to comply with IRS internal procedures. Alternatively, they contend that at the very minimum those Pinchot records not described in the search warrant should be returned and suppressed. With respect to the Rowland Lane documents, petitioners suggest that the consent was involuntary and was tainted by the illegal Pinchot search and seizure. In the alternative they assert that the consent was revoked and thus they are entitled to the suppression and return of the original records and those copies made after the consent was revoked.

Respondents oppose each of these arguments and request that the Court vacate the temporary restraining order and dismiss the amended petition.

*Business Opportunities Project*

This case presents novel issues concerning the use of undercover activities by the IRS. It appears that this is the first suit challenging the propriety of the BOP. As noted above the BOP involves IRS agents posing as prospective purchasers of businesses. By presenting themselves as interested buyers the agents attempt to obtain incriminating evidence by appealing to the seller's natural inclination to reveal skimming. A seller may be inclined to disclose to a buyer that he is skimming in order to present a more positive picture of the income of the business than is actually reflected on the records of the company.

Here the agents attempted to augment this tendency to reveal skimming by adopting a "good guy—bad guy" approach. Agent Manning was the "good guy" who would appear to be anxious to close the deal, while his "partner" agent Mason would be hesitant and insist on further documentation of the skim. This approach has the effect of encouraging the sellers to think that one of the partners is on their side and thus they will receive their asking price if only they can convince the "bad guy" of the true amount of the skim. Under these circumstances the sellers are more likely to produce the best available documentation of the skim, documentation that also will be the most damaging evidence in a later prosecution for tax fraud.

■ The reasonableness of warrantless searches during undercover operations turns on the particular circumstances of each case. *Lewis v. United States*, 385 U.S. 206, 208, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966). In this case the agents engaged in tactics which were specifically designed to induce petitioners to consent to a review of the skimming records. Moreover, when asked by the broker Bornstein whether he was with the IRS, Manning just laughed and said nothing. Yet not only is Manning an agent with the Criminal Investigation Division of the IRS, but it is clear that the

after an indictment or information is filed, it shall be treated also as a motion to suppress

under Rule 12.

IRS approached this as a criminal investigation, at least from the moment during the initial February 7 meeting when Manning first understood that Mr. Jones was skimming.

The court in *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977), set forth the standard which is applicable to the April 4 and April 25 consent searches: "It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent." This Court believes that the conclusion in *Tweel* is equally appropriate in this case: "From the facts we find that the agent's failure to apprise the appellant of the obvious criminal nature of the investigation was a sneaky deliberate deception by the agent under the above standard and a flagrant disregard for appellant's rights. The silent misrepresentation was both intentionally misleading and material." *Id.* Indeed, the facts of this case present an even more egregious intrusion on the rights of petitioners since they did not know Manning and Mason were associated with the IRS, whereas the appellant in *Tweel* was at least aware that he w. s dealing with agents he thought were engaging in a routine civil audit. Even agent Mason himself during his deposition evidenced concern for the propriety of the BOP: "There has always been a question in my mind as to how far you can go before you would give a person his *Miranda* warning. I have always had a problem with conducting a criminal investigation under the guise of something else. I feel that is a violation of a person's rights." (Deposition of James Mason, p. 48, lines 10–15).

■ Respondents advance two primary theories to justify the BOP against the Fourth Amendment challenge in this case. First, they contend that the April 4 and April 25 meetings were not searches since the agents were mere "receivers of information." It is clear that the activities of Manning on April 4 and the actions of Manning and Mason on April 25 were searches within the meaning of the Fourth Amendment. As the Court observed in *Haerr v. United States*, 240 F.2d 533, 535 (5th Cir. 1957): "A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest." *See United States v. Raub*, 637 F.2d 1205, 1207–08 (9th Cir. 1980).

■ Respondents next assert that if the meetings were searches, then they were "reasonable" searches similar to those upheld in cases involving undercover activities. This Court concludes that the attempted analogy to cases involving ongoing criminal activity falls far short of the mark. Simply stated, respondents have not cited any case which convinces the Court that the IRS is identical, or even substantially similar, to the FBI for purposes of analyzing the effect of undercover operations on Fourth Amendment rights. Most of the cited cases involve the possession or transfer of contraband, where there is a manifest public interest in preventing continuing crime and seizing items which pose a risk to the health and safety of society. *See, e. g., United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v. Guidry*, 534 F.2d 1220 (6th Cir. 1976). In that context, the suspect has no legitimate business or property interest in retaining possession or engaging in the transaction.

■ None of respondents' cases are analogous to the present circumstances in which the undercover operations are designed to secure evidence of a prior tax violation. Although the Court recognizes the importance of enforcing the tax laws, it cannot be said that noncompliance by a given taxpayer presents a threat to the general health and welfare of the public. In addition, it has been noted that society does have an interest in the propriety of police tactics regardless of the gravity of the offense being investigated. *United States v. Penn*, 647 F.2d 876, 886 (9th Cir. 1980) (Goodwin, J., dissenting). Furthermore, a taxpayer, whether complying or

noncomplying, has a legitimate interest in marketing his business.

 While the Court of course recognizes the "necessity of undercover work" and "the value it often is to effective law enforcement," *Weatherford v. Bursey*, 429 U.S. 545, 557, 97 S.Ct. 837, 844, 51 L.Ed.2d 30 (1977), it also appears to the Court that the unique nature and function of the IRS bears upon the question of the necessity for or value of undercover activities by IRS agents. Specifically, the value and necessity of the BOP is minimized to the extent that the continued operation of the project would interfere with the IRS' reliance on voluntary assessment and compliance by taxpayers. As the court noted in *Tweel*: "Our revenue system is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities." *Tweel, supra*, 550 F.2d at 300.

 The Court concludes that the orchestrated ruse employed by the respondents on April 4 and April 25 constitutes a search in violation of petitioners' Fourth Amendment rights. Under the fruit of the poisonous tree doctrine, information obtained as a result of an illegal search cannot be used to support a search warrant. *Alderman v. United States*, 394 U.S. 165, 177, 89 S.Ct. 961, 969, 22 L.Ed.2d 176, (1969); *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is the respondents' burden to show that the search warrant is not tainted by the previous illegal searches. *See Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Respondents have not met this burden. Accordingly, the Court concludes that the search warrant as well as the Pinchot search and seizure of May 1 are the direct products of the prior illegal searches on April 4 and April 25 and thus all the property seized pursuant to this warrant must be suppressed and returned to petitioners.

*Pinchot Residence*

Aside from the issue of the tainted search warrant, petitioners argue that all of the Pinchot records should be suppressed and returned on the grounds that the search and seizure was conducted in an unreasonable manner and went well beyond the scope of the warrant. In the alternative, petitioners assert that those items not described in the warrant were illegally seized and thus are subject to return and suppression. Respondents, on the other hand, insist that none of the Pinchot items were illegally seized, or, alternatively, that only the undescribed items ought to be suppressed and returned.

Petitioners maintain that the manner of the search and seizure was unreasonable since the "agents literally emptied the Joneses' home of all paper records even though the search warrant listed only five specific items." (Post Trial Memorandum of Points and Authorities, p. 3, July 14, 1981). While the Court certainly cannot condone this type of overreaching by the IRS, it appears that suppression and return of all the evidence is not the proper remedy for such conduct. In addressing this contention, the Court notes the analysis in *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974), where the majority of the court refused to suppress all of the seized evidence under a remarkably similar set of facts. Both here and in *VonderAhe* the most unreasonable aspect of the conduct of the IRS agents is the fact that they proceeded "to asport practically every piece of paper they could lay their hands on." *Id* at 365.

 The Court is also unable to accept the position at the other extreme taken by the respondents—that none of the Pinchot records should be suppressed or returned because of the method in which the search and seizure was executed. The search warrant here is extremely specific in describing the five items to be seized,[3] yet virtually

---

3. The warrant provided for the seizure of the following items:

1. Packages of sales invoices folded in half for the period December 23, 1975 to the present.

every item conceivably related to petitioners' financial affairs, as well as some unrelated items, was loaded into the IRS van. (Exhibits 12, 15). Respondents acknowledge that it is their burden to justify the seizure of the undescribed items by demonstrating a nexus between those items and the crime being investigated. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967); *see Andresen v. Maryland*, 427 U.S. 463, 483–84, 96 S.Ct. 2737, 2749–50, 49 L.Ed.2d 627 (1976). Respondents have failed to meet this burden, however, as there simply has been no adequate showing that any of the items beyond those enumerated in the warrant are relevant to a skimming case. Indeed, the fact that respondents did not find it necessary to retain as potential evidence the vast quantity of items voluntarily returned to petitioners on May 4 and May 7 suggests to the Court that respondents in effect have conceded that there is no nexus between those materials and a skimming charge.

If the Court had not already concluded that all of the Pinchot records should be returned and suppressed because of the illegal searches and the tainted warrant, the Court would be constrained to find that the intermediate position adopted by both parties—that only the undescribed items seized from the Pinchot residence should be returned and suppressed as a result of the manner in which the search and seizure was conducted—is supported under the law and the facts of this case. Authority for this approach in this circuit is also found in *United States v. Daniels*, 549 F.2d 665, 668 (9th Cir. 1977), where the court noted: "The exclusionary rule does not require the suppression of otherwise legal seizures merely because they were part of the same search in which an illegal seizure occurred." *See*

also, *United States v. Hubbard*, 493 F.Supp. 209, 222 (D.D.C.1979) and cases cited therein. As discussed above, the seizure of the Pinchot records is not "otherwise legal" since the seizure was based upon a tainted warrant.

*Rowland Lane Residence*

During the course of the Pinchot search and seizure on May 1, 1981, the agents obtained the consent of Mrs. Jones to allow the agents to search the Joneses' new home on Rowland Lane, to which they were in the process of moving. Later that afternoon two agents went to the Rowland Lane residence and seized approximately eight boxes of records. Testimony at the hearing revealed that Mr. Jones telephoned respondent Yost around 4:30 p. m. on the day of the search and demanded the return of all seized records. A written demand for the return of the records was presented to Ms. Yost by the Joneses' attorney on May 6.

■■■ Petitioners raise several arguments in seeking the suppression and return of the Rowland Lane documents. First, they assert that the consent to the search was not voluntary since Mrs. Jones in effect was in custody by the agents when she consented to the search. While the facts do not suggest that Mrs. Jones was in custody, consent to a search may be voluntary, even though it is given by a person in police custody. *United States v. Perez*, 644 F.2d 1299, 1302 (9th Cir. 1981). In any event, under the present circumstances respondents have met their burden of proving that the consent was given voluntarily. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■■■ Petitioners direct the Court's attention to *United States v. Taheri*, 648 F.2d 598 (9th Cir. 1981), where the court stated:

---

2. Manila envelopes containing corporate cash receipts/cash disbursements and general ledger sheets for the fiscal years ending November 30, 1976, 1977, 1978, 1979 and 1980.

3. Cash receipts/cash disbursements book (dark, bound, $8\frac{1}{2}'' \times 14''$), a general journal (dark, bound, $9'' \times 12''$), both for the fiscal year 1981.

4. Black and white cardboard container ($12'' \times 10'' \times 4''$) containing current duplicated bank deposit information, with customer identifying information, and current (1981) folded sales invoices.

5. A $5'' \times 6''$ sheet of paper containing summary listing skimmed receipts of Acme Meat Company, Inc. for the years 1975 through December 1980, inclusive, located in a two-drawer filing cabinet.

"Even assuming that the consent was voluntary, however, the evidence found as a result of that consent must nonetheless be suppressed if the unconstitutional conduct was not sufficiently attenuated from the subsequent seizure to avoid exclusion of the evidence." *Id.* at 601 (citation omitted). Respondents bear the burden of proving admissibility by showing that Mrs. Jones' consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *United States v. Perez-Esparza,* 609 F.2d 1284, 1289 (9th Cir. 1979), *quoting Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *see Taheri, supra,* 648 F.2d at 601. The Court concludes that respondents have not shown sufficient attenuation of the taint of the unlawful conduct in this case.

Mrs. Jones' consent was obtained on May 1 during the course of an illegal search of the Pinchot residence. Under these circumstances it is clear that there is a "close causal connection" between the unlawful conduct and the consent, *Dunaway v. New York, supra,* 442 U.S. at 218, 99 S.Ct. at 2259, and it is beyond question that the illegal activity tended to significantly direct the investigation toward obtaining the consent to seize the evidence in question. *United States v. Patino,* 649 F.2d 724, 729 (9th Cir. 1981); *United States v. Chamberlin,* 644 F.2d 1262, 1926 (9th Cir. 1980). Thus the consent was tainted. Moreover, respondents cannot point to the lapse of time or an intervening event that would serve to dissipate the taint. *See Taheri, supra,* 648 F.2d at 601. This is not a case in which the decision to consent was "completely self-motivated" or was unforseeable by the agents, where excluding the evidence from the ensuing search would serve no deterrent purpose. *Perez-Esparza, supra,* 609 F.2d at 1289; *see Brown v. Illinois,* 422 U.S. 590, 610, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J. concurring in part). It appears to the Court that respondents should not be permitted to exploit the illegality of their presence in the Joneses' home by exercising the opportunity to secure the consent of Mrs. Jones for the Rowland Lane search. *See Wong Sun v. United States, supra,* 371 U.S. at 488, 83 S.Ct. at 417. Therefore, consistent with the deterrence and judicial integrity purposes of the exclusionary rule, the Court will order the suppression and return of all the items taken from the Rowland Lane residence. *See Dunaway v. New York, supra,* 442 U.S. at 218, 99 S.Ct. at 2259; *United States v. Perez-Esparza, supra,* 609 F.2d at 1288–91.

 Petitioners also argue that they are entitled to the return and suppression of the Rowland Lane items on the separate ground that the consent to the search was revoked by the demands for their return. The Ninth Circuit has held that where a taxpayer consents to a taking of business records but later demands their return, the IRS must return the records and all copies made subsequent to the withdrawal of consent. *United States v. Ward,* 576 F.2d 243 (9th Cir. 1978); *see Mason v. Pulliam,* 557 F.2d 426 (5th Cir. 1977). This holding is directly applicable to the instant case. Accordingly, on this basis petitioners would be entitled to the suppression and return of all the original items taken from the Rowland Lane residence and those copies made subsequent to the withdrawal of consent at approximately 4:30 p. m. on May 1, 1981.

In their final post-trial brief petitioners raised an additional argument that the evidence should be suppressed because the agents failed to comply with guidelines for the BOP suggested by the National Director in his approval of January 23, 1981. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. Sourapas,* 515 F.2d 295 (9th Cir. 1975). In light of the Court's disposition in this case, the Court will decline to pass upon this issue.

## CONCLUSION

The Court concludes that the BOP has operated to violate petitioners' Fourth Amendment rights in that illegal warrantless searches were conducted on April 4, and April 25, 1981. Thus, the May 1 Pinchot search and seizure is rendered invalid since it was based upon a warrant tainted by

these prior illegal searches. Consequently, petitioners are entitled to the suppression and return of all the Pinchot items on that basis. If the Court had not so concluded, petitioners would be entitled to the return and suppression of those Pinchot records not within the scope of the warrant on the separate ground that the search and seizure was executed in an unreasonable manner.

The Court will order the return and suppression of all the Rowland Lane items since the consent to that search was tainted by the unlawful conduct of respondents. Even were that not so the revocation of the consent would independently require the suppression and return of the original Rowland Lane records as well as all copies made after the consent was withdrawn.

THEREFORE, IT IS ORDERED vacating the temporary restraining order of June 10, 1981 and now granting the petition to the following extent:

1. Respondents are ordered to return to petitioners all books, records, correspondence, documents and other items, and all copies thereof, as well as all extracts, including all evidence obtained directly therefrom, in possession of federal authorities, that were obtained contrary to law and as a result of the unlawful searches and seizures in this case; and

2. Respondents are permanently restrained and enjoined from using in any criminal proceeding against petitioners any written documents or evidence, copies thereof, all notes, all memoranda, and other reproductions and summaries thereof, relating to tax matters of corporate petitioner for the fiscal years ending November 30, 1976 through November 30, 1980, inclusive, and individual petitioners for the calendar years ending December 31, 1976 through December 31, 1980, inclusive, obtained by respondents from petitioners.