William E. JONES and Gladys A. Jones, husband and wife, and Acme Meat Company, Inc., an Arizona corporation, Petitioners-Appellees,

v.

Prescott A. BERRY, District Director, Internal Revenue Service; David C. Arnell, Chief, Criminal Investigation Division, Internal Revenue Service; Bernice Yost, Group Manager, Criminal Investigation Division, Internal Revenue Service; John M. Manning, Special Agent, Criminal Investigation Division, Internal Revenue Service; James E. Mason, Special Agent, Criminal Investigation Division, Internal Revenue Service; John Doe I–X, inclusive, and Jane Doe I–X, inclusive, Respondents-Appellants.

No. 81–5922.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 13, 1982.

Decided Oct. 24, 1983.

---

Stephen E. Silver, Burch & Cracchiolo, P.A., Phoenix, Ariz., for petitioners-appellees.

Robert Lindsay, U.S. Dept. of Justice, Washington, D.C., for respondents-appellants.

Before SKOPIL and FLETCHER, Circuit Judges, and McNICHOLS,[*] District Judge.

FLETCHER, Circuit Judge:

The Internal Revenue Service (IRS) appeals from the district court's grant of appellee's pre-trial motion to suppress evidence. The IRS challenges the holding that appellees' fourth amendment rights were violated by IRS undercover agents who elicited incriminating information from them by false pretenses. Our court's jurisdiction rests on 28 U.S.C. § 1291 (1976). We reverse and remand. 524 F.Supp. 645.

## I

## FACTS

In May of 1977, IRS Special Agent John Manning requested approval for an undercover operation designed to discover tax fraud by owners of businesses offered for sale. Manning proposed examining the tax returns of businesses that were for sale to determine the potential for skimming income [1] from the business. Where skimming appeared possible, special agents, posing as prospective purchasers of the business, would meet the business sellers, gain their confidence, and then attempt to obtain evidence of skimming for use in subsequent tax prosecutions. The project, known as the Business Opportunity Program (BOP), was approved by the Arizona District IRS

---

[*] The Honorable Ray McNichols, United States District Judge for the District of Idaho, sitting by designation.

1. "Skimming" income is the removal of a portion of gross income without entering it in financial records of a business' bookkeeping system. The skimmed income thus never shows up in the bookkeeping system and is not reported as income for tax purposes.

Director in June of 1977 and by the National Director in January of 1981.[2]

Special Agent Manning initiated the BOP by checking newspaper advertisements of businesses for sale. On January 10, 1981, he visited the offices of a business broker, telling the broker that he and his partner were looking for businesses to purchase in the Phoenix area. Though skimming was not openly discussed, Manning suggested subtly that he was particularly interested in businesses with a cash flow susceptible to skimming. The broker mentioned that he knew a company that might suit Manning's purpose. Whether skimming was actually occurring at the company was never discussed but the characteristics of the business that would make it susceptible to skimming were discussed.

On February 7, 1981, the broker identified to Manning the business he had in mind as Acme Meat Co. After Manning executed an agreement providing for confidentiality of all information he received about the company, the broker permitted him to examine Acme's corporate income tax returns for 1976, 1977, and 1978. After reviewing the tax returns, Manning and the broker visited the premises of Acme where they met William Jones, the owner and toured the business. Manning's discussion with Jones regarding skimming did not go beyond hints and suggestions, but Manning gained the impression that Jones was skimming. At the close of the February 7 meeting, Manning indicated he was interested in the business and would like to see the books and records.

At a second meeting arranged for April 4, Manning and the broker met Jones at his personal residence. Manning examined the cash receipts and disbursements ledger, invoices, certain other business records, and the general corporate ledger. Manning was not supplied any records that would constitute "documentable proof" of unreported income under the BOP guidelines. But Manning persisted seeking another meeting which took place on April 25, 1981.

Manning, accompanied by Special Agent Mason, met Jones at the Acme Meat Company factory. Mason blatantly suggested that he and Manning were interested in purchasing a business that could generate substantial skimming. They demanded to see records supporting Acme's purported skim. Jones led the agents to his home where Mrs. Jones produced records which substantiated the skim. The agents left, promising to contact the Joneses promptly about their decision.

■ On May 1, 1981, armed with a search warrant, several IRS agents went to the Jones home. Two of the agents approached Mrs. Jones in the front yard of her home. Noting the home was for sale, they announced that they were realtors interested in viewing the premises. Once inside, they informed Mrs. Jones that they were Internal Revenue Service special agents with a search warrant. A thorough search of the house ensued. A second residence owned by the Joneses was also searched pursuant to Mrs. Jones' consent. During the search, IRS agents seized 16 boxes of papers, records and books. In addition to business records the agents seized a file cabinet, an adding machine, rubber bands, pencils, stamps, paperclips and other office supplies, a popcorn popper warranty and a book on body building. Three thousand items were taken from the Joneses' two residences.[3]

---

**2.** The BOP was initially disapproved by the National Director. Eventually efforts to secure national approval met with success. Upon approval, the National Director warned the agents that "indiscriminate usage, absent sufficient basis, could potentially adversely reflect upon the service." Two express conditions were imposed:

At the very least, before an agent contacts a business seller, we should have a reasonable basis to believe that the taxpayer offering the business for sale has understated the reported net profit of the business. Also, the [tax] returns of the business do not reflect a realistic picture of income when compared with the asking (selling) price. [sic]

**3.** The district court correctly ruled that all items seized in excess of those named in the search warrant should be returned to the Joneses. *See VonderAhe v. Howland,* 508 F.2d 364, 368, 372 (9th Cir.1974).

At least two requests were made for the return of all or part of the items seized. Finally, on May 27, 1981, the Joneses and Acme Meat Co. filed a motion under Rule 41(e) of the Federal Rules of Criminal Procedure seeking the return and suppression of the seized records. Following an evidentiary hearing, the district court granted the relief requested.

The district court found that although the undercover operation might have been valid if performed by a different law enforcement agency seeking evidence of a different kind of crime, it was an unreasonable search when done by the IRS and violated appellees' fourth amendment rights. *Jones v. Berry,* 524 F.Supp. 645, 652 (D.Ariz.1981). Finding that the information for the search warrant had been obtained as a result of impermissible undercover activities, the court suppressed the evidence obtained by the IRS. *Id.* As to the items seized at the second house, the trial court held that, even absent a finding of a fourth amendment violation as to the search for and seizure of those items, the IRS should return all items seized at the second residence because the Joneses had effectively withdrawn their consent to the search by requesting the return of the documents. *Id.* at 654.

## II

## DISCUSSION

### A. The "Search" of Appellees' Home by the IRS.

■ The analytic framework for determining whether law enforcement activities constitute a search within the meaning of the fourth amendment is found in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), particularly in Justice Harlan's concurring opinion. In *Katz,* government agents eavesdropped on conversations in a telephone booth by means of an electronic listening device attached to the top of the booth. Holding that "the

Fourth Amendment protects people, not places," *id.* at 351, 88 S.Ct. at 511, the Court discarded the trespass analysis applied in prior cases to determine whether a fourth amendment search occurred. *Id.* at 351–53, 88 S.Ct. 511–512. The Court concluded that, despite the absence of a physical intrusion into the telephone booth, the agents' actions "violated the privacy upon which [the defendant] justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. at 512. As stated more explicitly by Justice Harlan, the Court in *Katz* recognized two requirements for the existence of a privacy interest protected by the fourth amendment: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Where both prongs of the test are met, law enforcement activity that intrudes upon the privacy interest is considered a search within the meaning of the fourth amendment. We turn to an application of the *Katz* test to the facts of the case before us.[4]

The district court, after its review of the facts "conclude[d] that the orchestrated ruse employed by the [IRS agents] on April 4 and April 25 constitute[d] a search in violation of petitioners' Fourth Amendment rights." 524 F.Supp. at 652. In its view, undercover activities, while often necessary to effective law enforcement, should not be sanctioned when employed by the IRS because such operations "would interfere with the IRS' reliance on voluntary assessment and compliance by taxpayers." *Id.* Indeed, the court found that "the IRS is [not] identical, or even substantially similar, to the FBI for purposes of analyzing the effect of undercover operations on Fourth Amendment rights." While we agree with the district court that the BOP, even if implemented in conformity with the National

---

**4.** We review the district court's conclusion that a violation of the fourth amendment occurred in this case under the de novo standard applicable to questions of law. *See United States v. Bates,* 533 F.2d 466, 468 (9th Cir.1976).

Director's requirements, may ultimately be destructive, we reluctantly disagree that such policy concerns can control our decision here. The district court's failure to apply the *Katz* test leaves essentially unsupported its conclusion that a fourth amendment search occurred in this case.[5]

When the *Katz* standard is applied to the facts presented by this case, we conclude that the IRS activities with respect to the Joneses and Acme Meats, however unwise and shortsighted they may have been, did not constitute a search within the meaning of the fourth amendment. The first part of the *Katz* test asks whether the Joneses exhibited by their conduct an intention to preserve as private the evidence of skimming obtained by the IRS agents. *See Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Pertinent to answering this question are the decisions of the Supreme Court in *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). In *Hoffa,* the Court stated that the fourth amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. at 413. In subsequent cases, courts have applied the "misplaced

confidence" doctrine of *Hoffa* to undercover activities by agents of the Internal Revenue Service, *see United States v. Scott,* 521 F.2d 1188, 1191 (9th Cir.1975); *see also United States v. Irvine,* 699 F.2d 43, 45–46 (1st Cir.1983) (noting possible applicability of *Hoffa*), to investigations of past criminal activities, *see United States v. Davanzo,* 699 F.2d 1097, 1100 (11th Cir.1983) (citing *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)), and to confidences revealed to agents as well as informers, *see United States v. Schuster,* 684 F.2d 744, 747–48 (11th Cir.1982), *rehearing granted,* 697 F.2d 910 (11th Cir.1983); *United States v. Scott,* 521 F.2d at 1191. The chief remaining limitation on the "misplaced confidence" doctrine appears to be that the agent or informer may not search for evidence not voluntarily revealed by the unsuspecting criminal. *Compare Lewis v. United States,* 385 U.S. at 209–10, 87 S.Ct. at 426–427, *with Gouled v. United States,* 255 U.S. 298, 305–06, 41 S.Ct. 261, 263–264, 65 L.Ed. 647 (1921). *See United States v. Schuster,* 684 F.2d at 748–49 (scope of search must be limited to consent given). This limitation, however, is not applicable to appellees' case.[6] Accordingly, we believe that *Hoffa* and its progeny compel the conclusion that when, as here, undercover agents gain the confidence of one suspected of criminal activity, and the suspect later

5. The district court relied principally on the Fifth Circuit's decision in *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir.1977), to conclude that a violation of the fourth amendment occurred in this case. *Tweel,* however, is distinguishable. There, IRS agents, known to the suspect to be IRS agents empowered to conduct civil audits, abused the voluntary civil tax reporting and investigation system by inducing the suspect to turn over records for a criminal investigation. Thus, they abused the powers of their positions. Here, by contrast, the IRS agents did not pretend to be civil agents, thereby implicitly invoking their powers as civil investigators, when in fact they intended to conduct a criminal investigation. Rather, the agents pretended to be fellow criminals in order to gain the Joneses' confidence. Such deception is far different from that practiced in *Tweel.* The other cases relied upon by the Fifth Circuit in support of the rule of *Tweel* are subject to the same distinction, *see United States v. Rothstein,* 530 F.2d 1275, 1278 (5th

Cir.1976); *United States v. Dawson,* 486 F.2d 1326, 1329 (5th Cir.1973); *United States v. Bland,* 458 F.2d 1, 8 (5th Cir.1972), *cert. denied,* 409 U.S. 843, 93 S.Ct. 43, 34 L.Ed.2d 83 (1972); *United States v. Tonahill,* 430 F.2d 1042, 1044 (5th Cir.1970), *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970); *United States v. Prudden,* 424 F.2d 1021, 1033 (5th Cir.1970), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), as are the cases from this circuit, *see United States v. Robson,* 477 F.2d 13, 17 (9th Cir.1973); *Simon v. United States,* 421 F.2d 667, 668 (9th Cir.1970), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1691, 26 L.Ed.2d 62 (1970); *Spahr v. United States,* 409 F.2d 1303, 1306 (9th Cir.1969), *cert. denied,* 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969).

6. There is, for example, no argument that the agents in this case heard or saw anything that the Joneses did not intend them to hear or see. *Lewis v. United States,* 385 U.S. 206, 209–10, 87 S.Ct. 424, 426–27, 17 L.Ed.2d 312 (1966).

voluntarily reveals to the agents evidence of crimes, he or she can have no expectation of privacy in the information so revealed. *See United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 1124–1125, 28 L.Ed.2d 453 (1971) (plurality opinion). Government discovery of information or activities, as to which a defendant exhibits no expectation of privacy, is not a search within the meaning of the fourth amendment. *See, e.g., Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); *United States v. Kramer,* 711 F.2d 789 at 793–794 (7th Cir.1983) (discussing police search of trash containers).[7]

Our conclusion that there has been no fourth amendment violation in this case should not be misconstrued as approval of the tactics employed by the IRS agents. It is plain from the record that the IRS has violated its own policy on undercover operations. The agents involved admit that neither of the National Director's express conditions for implementation of the BOP were met until long after the Jones investigation began.[8]

Democratic governments are based on a relationship of trust between government and the governed. If the possibility exists that the next acquaintance one makes may be a government agent conducting a hidden investigation unjustified by any indication of wrongdoing, every relationship will be tainted by suspicion and fear.

## B. The "Consent Search" of Appellees' Second Residence.

When the IRS searched the Jones residence on May 1, it discovered that some of the documents named in the search warrant had been moved to a second house owned by the Joneses. The IRS agents sought and received permission from Gladys Jones to search the second residence for the items listed in the warrant. On the same day, after the search of the second residence had been completed, William Jones telephoned the IRS stating that he was withdrawing the consent to search the second residence and wanted the IRS to return all documents seized there. The IRS refused.

In their motion pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, the Joneses requested the district court to suppress all evidence seized by the IRS at their second residence on alternate grounds. First, they argued that the search of the second residence was tainted by its close connection to the allegedly illegal search of the first residence, and second, they argued that the seizure of evidence from the second residence was conducted in the absence of effective consent. The district court agreed with both contentions and ordered the suppression and return of any evidence discovered there.

Because the district court erred in its conclusion that the search of the first residence was illegal, suppression of evidence found at the second residence is not warranted on the ground that the search of the second residence was tainted by the search of the first. We must, therefore, determine whether the district court correctly concluded that the evidence seized at the second residence should be suppressed on the independent ground that the search of the second residence was conducted in the absence of effective consent. The district court relied on *United States v. Ward,* 576 F.2d 243 (9th Cir.1978).

*Ward* held that a person may revoke a consent to search at any time *prior* to the completion of the search. The court remanded for an evidentiary hearing to segregate the evidence gathered before from

---

**7.** There is no allegation that the IRS undercover operations were in excess of statutory authority or conducted in violation of specific statutory or regulatory authority. While we agree with the policy considerations discussed in the district court opinion we are unable, on the facts of this case, to agree that the district court's suppression order should be sustained by the exercise of our supervisory powers. *See United States v. Caceres,* 440 U.S. 741, 755–57,

99 S.Ct. 1465, 1473–1474, 59 L.Ed.2d 1733 (1979); *United States v. Irvine,* 699 F.2d 43, 45–46 (1st Cir.1983).

**8.** The violations of policy by the IRS agents subject them to sanctions from within the agency. We assume the sanctions will be applied to prevent further abuses.

that gathered after the revocation of consent and did not foreclose the government from securing the material as to which the search had not been completed by other lawful means.

■ In this case, Mrs. Jones consented to a search of her second residence for certain records named in a search warrant. This search was carried out and the items named were discovered and seized before William Jones revoked the consent granted by his wife. Had the revocation of consent occurred before the IRS agents completed their search of the second residence for the documents named in the warrant, *Ward* would compel the conclusion that any further search of the residence for the documents subsequent to the revocation of consent would be illegal, but that is not the situation with which we are faced. The house was searched and the documents seized before the consent was revoked.[9] Accordingly, the district court erred in ordering suppression of the evidence seized at the Joneses second residence on the basis of our decision in *United States v. Ward.*

### III

### CONCLUSION

Because the district court erred in finding that the IRS activities in this case violated the fourth amendment, and because it erred in concluding that the IRS had searched one of the Jones residences in the absence of effective consent, its judgment granting the appellees' motion to suppress and return evidence under Fed.R.Crim.P. 41(e) must be reversed and the case remanded for further proceedings.

REVERSED and REMANDED.

9. No claim can be made that items seized in the course of a consent search, if found, must be returned when consent is revoked. Such a rule would lead to the implausible result that incriminating evidence seized in the course of a consent search could be retrieved by a revocation of consent.